Robert G. Bernhoft (Wis Bar No. 1032777)
THE BERNHOFT LAW FIRM, S.C.
1710 W. Sixth Street
Austin, Texas 78703
(512) 582-2100 telephone
(512) 373-3159 facsimile
rgbernhoft@bernhoftlaw.com
Attorney for Defendant Marco Santarelli
Appearing *pro hac vice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARCO GIOVANNI SANTARELLI,<br><br>Defendant. | ) | Case No. 8:25-cr-00174-FWS<br><br>**DEFENDANT SANTARELLI'S SENTENCING MEMORANDUM**<br><br>Hearing Date: October 15, 2026<br>Hearing Time: 11:00 a.m. |

**COMES NOW** Defendant Marco Santarelli, by and through his counsel of record, the Bernhoft Law Firm, S.C., and respectfully files this Sentencing Memorandum in support of his sentencing scheduled for October 15, 2026.

## PROCEDURAL POSTURE AND PRESENTENCE INVESTIGATION REPORT ("PSR")

Mr. Santarelli received a criminal investigation target letter from the U.S. Attorney's Office for this District in February 2025. Within thirty days, Mr. Santarelli retained counsel and instructed the undersigned to engage the U.S. Attorney's Office to discuss a plea agreement resolution. After those discussions concluded, Mr. Santarelli entered into a plea agreement on August 28, 2025.

(Doc. 8.) A sealed Information was subsequently filed on September 8, 2025. (Doc. 1.) On October 20, 2025, this Court held a Change of Plea hearing, and Mr. Santarelli pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. (Doc. 15.)

The Presentence Investigation Report ("PSR") was filed on September 14, 2026. (Doc. 27.) The PSR calculated a Total Offense Level of Level 26 and a Criminal History Category I. *Id.* at p. 3. Mr. Santarelli concurs with the PSR's Guidelines calculations and the resulting Total Offense Level of 26:

**The PSR's Offense Level Computation:**

| | |
|---|---|
| Wire Fraud Base Level Offense | 7 |
| Fraud Loss (> $25 million but < $65 million) | +22 |
| Greater than 10 victims | +2 |
| Acceptance of Responsibility | -2 |
| Additional Acceptance Reduction | -1 |
| Zero-point offender Reduction | -2 |
| **Total Offense Level** | **26** |

(PSR, Doc. 27, pp. 8-9, ¶¶ 29-44.)

Based on these Guidelines calculations, the PSR determined the advisory sentencing range for Mr. Santarelli is 63 to 78 months. (Doc. 27, p. 20, ¶ 104.) Mr. Santarelli concurs with the PSR's calculation of the advisory sentencing range.

## ARGUMENT

The ultimate issue before the Court is a determination of what sentence will be minimally sufficient, but not greater than necessary, to meet the goals of our sentencing regime codified at 18 U.S.C. § 3553. Pursuant to the High Court's teachings in *Booker* and its progeny, this statutory mandate requires the sentencing court to consider all of the defendant's individual characteristics and

circumstances of the offense, and if necessary, reject advisory guidelines that are not based on national sentencing data and empirical research. *See United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Spears v. United States*, 555 U.S. 261 (2009); *Nelson v. United States*, 555 U.S. 350 (2009); *United States v. Ruiz-Apolonio*, 657 F.3d 907, 917 (9th Cir. 2011).

After the Supreme Court held in *Booker* that the federal sentencing guidelines were advisory and not binding on the sentencing court, the High Court recognized the power of the sentencing court to impose a sentence outside the advisory guideline range considering not only the facts of the case before it, but also policy considerations, including disagreement with the policies underlying the guideline applicable to the case. *Gall*, 552 U.S. at 59; *Kimbrough*, 552 U.S. at 101; *Rita*, 551 U.S. at 351. As the Ninth Circuit has explained: "As the Supreme Court through *Booker*, *Kimbrough*, and *Spears* has instructed, . . . sentencing judges can reject *any* Sentencing Guideline, provided that the sentence is reasonable." *United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010).

In turn, the sentencing court "may not presume that the Guidelines range is reasonable," but rather must "make an individualized assessment based on the facts presented" to arrive at a sentence that is sufficient, but not greater than necessary. *Gall*, 552 U.S. at 50; *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). In doing so, the court is required to follow the framework set forth in § 3553(a), as further informed and guided by Supreme Court authority, and consider all mitigating factors that are relevant to any purpose of sentencing. After calculating the applicable guidelines range, the court must consider the statutory factors listed in 18 U.S.C. § 3553(a) to determine whether a sentence within the guidelines range is appropriate. All told, Section 3553(a) requires the imposition

of a sentence sufficient, but not greater than necessary to achieve respect for the law, just punishment, deterrence, protection of the public, and needed education and treatment, taking into account the nature of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities, and the Guidelines.

The Guidelines calculation is important, though, because an incorrect calculation is almost never harmless error. *Molina-Martinez v. United States*, 578 U.S. 189, 204 (2016) ("[A] defendant sentenced under an incorrect Guidelines range should be able to rely on that fact to show a reasonable probability that the district court would have imposed a different sentence under the correct range. That probability is all that is needed to establish an effect on substantial rights for purposes of obtaining relief under Rule 52(b)."). As this Circuit has thoughtfully opined:

> A mistake in calculating the recommended Guidelines sentencing range is a significant procedural error that requires us to remand for resentencing. . . . The Supreme Court has made clear that the district court must correctly calculate the recommended Guidelines sentence and use that recommendation as the "starting point and initial benchmark."

*United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) (quoting *Kimbrough*, 552 U.S. at 108).

**I. A Below Guidelines Sentence is Well Warranted under the Rubric of § 3553(a).**

A below Guidelines sentence is well warranted based on Marco Santarelli's unique history and individual characteristics, along with salient sentencing data regarding recidivism rates and deterrence. Such a sentence will provide adequate general and specific deterrence, adequate punishment, and promote respect for the law, while encouraging parsimonious and non-disparate sentences.

**A. A Sentence of Incarceration will not Provide Additional Deterrent Effect.**

The rationale behind harsher punishments is the general and specific deterrent effect they will have in preventing recurrences of such crimes. This philosophy, however, is increasingly scrutinized as flawed. *See* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27 (2015). It is highly unlikely that a substantial prison sentence would have any additional deterrent effect on Mr. Santarelli. The criminal fraud investigation, indictment, and the ongoing proceedings have taken a considerable toll on Mr. Santarelli on both a personal and financial level. His reputation has been destroyed and his finances are in ruins. Mr. Santarelli will have to work for the rest of his life to pay off the very substantial restitution amount he will owe after sentencing. Mr. Santarelli knew all of this when he instructed undersigned counsel – within a month of receiving a February 2025 target letter from the U.S. Attorney's Office – to engage the Government in a plea agreement discussion. Mr. Santarelli is a fifty-seven-year-old man who has destroyed his life, and no further deterrence is needed.

**B. Marco Santarelli is Not a Threat to his Community and He is Highly Unlikely to Recidivate.**

Marco Santarelli's very low risk of recidivism also favors a downward variance in his sentence. Not only is the risk of recidivism rate for all defendants convicted of a white-collar offense extremely low. *See* Daniel Glaser, *Effectiveness of a Prison and Parole System*, pp. 36-37 (1964); P.B. Hoffman & J.L. Beck, *Burnout -- age at release from prison and recidivism*, 12 J. Crim. Just. 617 (1984). It is especially so for older offenders, like Mr. Santarelli, over the age of 50. *See* U.S. Sent'g Comm'n, *Older Offenders in the Federal System*, July

2022.[1] "The recidivism rate of older offenders (21.3%) was less than half that of offenders under the age of 50 (53.4%)." *Id.*, p. 5. In a case examining the consequences of increasing good time credits to reduce the prison population, a sister court in this Circuit examined the relation of length of sentence to likelihood of recidivism, and noted: "[C]riminologists have known 'for many, many, many years' that generally 'there is no difference in recidivism rates by length of stay' in prison . . ." *Coleman v. Schwarzenegger*, 922 F.Supp.2d 882, 976 (E.D. Cal. 2009) (quoting an expert's testimony). *See also United States v. Martinez*, 184 F. Supp. 3d 1209, 1231-32 (D.N.M. Apr. 27, 2016) ("The Court has reviewed the leading research and concluded that the weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed -- has little to no significant correlation to recidivism. This trend obtains even for white-collar criminals." (citations omitted).

A number of Mr. Santarelli's personal characteristics suggest that he is highly unlikely to recidivate, *see* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing* Guidelines, (Res. Ser., rel. 1, May 2004) ("*Measuring Recidivism*").[2] Santarelli is 57 years old and only 6.2% of Category I defendants aged over 50 years old recidivated. *Id.*, Ex. 9, at 28. College graduates like Santarelli also recidivate at a much lower rate than others at 7.1% for Category I defendants. *Id.*, Ex. 10, at 29. Finally, Santarelli is divorced, and both divorced and defendants in a legal marriage recidivate at 9.8%

---

[1] This document is located at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Older-Offenders.pdf (last accessed Sept. 26, 2026).

[2] This document is located at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last accessed on Sept. 26, 2026).

if those defendants are Category I. *Id*. Ex. 10, at 29. According to the available sentencing data, several of Santarelli's personal characteristics yield lower recidivism rates than defendant peers with similar offense conduct, but having different individual characteristics.

The U.S. Sentencing Commission released a newer study from 2021 that reported on the recidivism rates of prison inmates released in 2010. *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010*, (Sept. 2021).[3] According to this report, only 15.0% of inmates from 50 to 59 years old who were Category I defendants recidivated, and this was among all categories of Defendants. *Id*., p. 30, Table 4. Furthermore, fraud, theft, and embezzlement had the lowest rates of recidivism among all categories of crimes, only 35.5% compared to over 64.1% for violent offenders. *Id*., p. 32, Figure 17. Additionally, the more education one has, the less likely the defendant will recidivate: 19.6% for college graduates compared with 60.8% for less than high school, and 50.2% for a high school graduate. *Id*., p. 31, Table 5.

Mr. Santarelli has been convicted of a serious felony, and some incarceration is warranted given the nature of the offense, but given the statistical data above, Mr. Santarelli does not need a lengthy sentence to discourage recidivism. Mr. Santarelli has never been violent or a danger to others, and at his age, he isn't going to start down that path now. A sentence should be no more than needed to punish Mr. Santarelli for the acts he committed and to provide adequate deterrence to others generally.

---

[3] This document is located at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (last accessed on Sept. 26, 2026).

### C. A Sentence Below the Guidelines is Amply Sufficient to Provide Adequate Deterrence while Appropriately Punishing Mr. Santarelli.

The United States Sentencing Commission has produced statistics annually for many years that set forth the sentences that have been imposed as they relate to various types of criminal offenses. In the area of fraud, prison sentences in the Central District of California have been imposed at a slightly lower rate than the national trend. Nationally, 40.7% of sentences in fraud/theft/embezzlement cases resulted in sentences within the Guidelines calculation. U.S.S.G., *Statistical Information Packet, Fiscal Year 2025, Central District of California*, Table 10, p. 16.[4] That leaves almost 60% of cases were outside the Guidelines. *Id*. Table 10, p. 16. Only 1.1% of the sentences went over the range, but downward departures and variances made up 5.1% and 46.9% of those sentences, respectively.

The United States Sentencing Commission also releases statistics published by the Judiciary Sentencing Information ("JSIN"), which is relevant here. *See* JSIN, available at https://jsin.ussc.gov/ (last accessed on Sept. 26, 2026). These statistics cover the last five fiscal years of data, 2021 through 2025. Using the data from the PSR here, namely a final offense level calculation of 26 and criminal history category of I, and a base offense level found at Guidelines § 2B1.1, 52% of defendants received a downward departure or variance, and only 22% were sentenced within the advisory range. The median and mean length of sentence was 48 months. The median 48-month sentences were calculated by excluding cases impacted by a § 5K1.1 motion. Notably, the Probation Officer's

---

[4] This document can be found at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2025/cac25.pdf (last accessed on Sept. 26, 2026).

recommendation of a 51-month sentence is slightly *more* than the statistical median. (Doc. 26, p. 8.)

These statistics show that in a substantial number of cases, the public policy need for deterrence and punishment as part of a criminal sentence can be met by imposing a sentence below the Guidelines range. In this case, given the unique characteristics of Mr. Santarelli, a sentence below the Guidelines range would not be an outlier result, will provide the community with the adequate sense of fair punishment that fits this crime, and will not be more than necessary to meet the sentencing goals of § 3553(a).

### D. Numerous Highly Positive Individual Characteristics of Marco Santarelli Recommend a Downwardly Variant Sentence.

We are all thankfully the sum of everything we are and do in life, for who could suffer anything but harsh punishment if judged only on one's mistakes? The Sentencing Guidelines recognize this contextual importance and require individualized sentences based upon the defendant's individual characteristics. Here, as exemplified in the numerous support letters written for Mr. Santarelli, a clear picture emerges of a generous, caring, thoughtful, and selfless man who went well out of his way to provide friendship, support, and time to his friends, family, and colleagues. The letter writers opine at length on Mr. Santarelli's honesty, integrity, selflessness, and modest lifestyle.

Scott Abrams, a veteran Chief Executive Officer of over thirty years, writes that "assessing people's honesty, integrity, judgment, and reliability was an important part of my work. That experience has made me cautious about whom I trust and attentive to how people behave over time." (Ex. 1.) Mr. Abrams concludes that "I have come to regard Marco as a genuinely decent person – someone I found candid, thoughtful, generous, and worthy of my trust." Marco's cousin Paul Antenucci relates that as a young man he went through a particularly

difficult and emotional relationship breakup, and that Marco was there for him: "What may have seemed like a simple conversation at the time became one of the meaningful and important conversations I have ever had with someone. I still remember his words and the support he gave me." (Ex. 2.) Close friend Anthony Busciglio "always found [Marco] to be honest and generous." (Ex. 3.) Michael Drew, a close friend of over fifteen years, relates that Mr. Santarelli "[is] a person of honesty, integrity, trustworthiness, and strong character." (Ex. 4.) Mr. Drew also declares that "[Marco] is someone whose word I have trusted and whose commitments I have relied upon." *Id.*

John Fornaro, another veteran Chief Executive Office who's known Mr. Santarelli his entire life, relates an important fact about him he's always respected:

> The thing I most want the Court to understand about Marco is how he has lived. Marco has never lived a luxurious life. He has been in the same house for twenty years and has driven the same car for the last ten. In all the decades I have known him, I have almost never seen him take time for himself. His life has been work and caring for his wife.

(Ex. 5.)

Another life-long friend, Romeo Fornaro, opines at length about watching Mr. Santarelli's devotion to his wife, particularly her battle with cancer – which commenced prior to their marriage – and his continuing support and care as she continues to suffer debilitating health issues. (Ex. 6.) As Mr. Fornaro relates: "Seeing that level of commitment, compassion, and selflessness over many years showed me the kind of husband, father, and person Marco truly is." *Id.* Mr. Fornaro concludes by noting that "A lengthy prison sentence would have a profound impact on Marco's family, especially his daughter Angelina. Throughout her life, he has been a constant source of love, guidance, and support.

It would also affect those of us who have had the privilege of knowing him for decades." *Id.*

Another long-time company executive, Keith Jarrett, echoes other writers' testaments to Mr. Santarelli's good character. As Mr. Jarrett's "Chief Technology Officer, [Marco] built, hired and managed a department of more than 60 employees . . . . Marco consistently demonstrated strong leadership, sound judgment, and integrity." (Ex. 7.) Mr. Jarrett concludes: "The Marco I know is a good friend, a talented businessman, and someone whom I have trusted and respected for most of my professional life." *Id.* Mr. Santarelli's friend of over twenty-eight years, Rick Ladendorf, echoes the thoughtful comments of other writers when he declares that: "The Marco I have known for nearly three decades is intelligent, charismatic, funny, hardworking, and deeply loyal . . . . More importantly, he has been a devoted father and a dependable friend. He is one of the hardest-working people I know and remains one of my closest friends." (Ex. 8.)

Craig Robertson, a retired Calgary, Canada Police Sergeant who's known Mr. Santarelli for thirteen years observes that: "Despite the recent criminal charge which [Marco] took immediate responsibility for, I have the deepest respect for Marco over the years on how he has conducted himself in all other aspects of his life and appreciate the mutual respect and concern he has shown me and my family as well." (Ex. 9.) Rob Sinclair has been a close friend of Mr. Santarelli's for thirty-eight years and echoes the sentiments that weave through each and every support letter, declaring him fair, modest, and generous: "His word is trustworthy; when Marco commits to something or someone, he follows through." (Ex. 10.)

Dr. Brian Lo, Mr. Santarelli's longtime physician, describes his thoughts and feelings upon hearing of his criminal case: "This news deeply saddened me,

as it stands in stark contrast to the individual I have come to know over a decade of personal interactions and observation. Marco has always demonstrated kindness, a strong work ethic, honesty, and high personal integrity." (Ex. 11.) Mr. Santarelli's mother, Lina Castle, describes raising him and his siblings alone, working "two jobs to keep us going." (Ex. 12.) Ms. Castle relates that Marco took a grocery store job at 15 years old and shoveled snow for neighbors, then turned his earnings over to her to "help pay the bills." *Id.* Ms. Castle speaks to Mr. Santarelli's care and support for her after she "suffered a serious heart attack" two years ago, and "continue[s] to struggle every day with multiple severe health problems." *Id.* Ms. Castles worries that a prison term would deprive her of Mr. Santarelli's care and support – not just out of the mother-son relationship, but as her best friend. *See id.*

Ross McCague has known Mr. Santarelli for fourteen years and had this powerful comment: "Marco is someone who shows up for people. He listens. He cares. He puts others first in ways that are increasingly rare in this world." (Ex. 13.) Mr. McCague further opines that "[Marco] is a man who feels deeply, who takes responsibility seriously, and who has always tried to live his life with honesty and good intentions." *Id.* Mr. McCague's closing comments bear full quotation here:

> What pains me most is knowing how heavily this situation weighs on him. Marco is not someone who brushes off mistakes or hides from accountability. He is someone who reflects, who learns, and who genuinely wants to make things right. I have watched him struggle with the emotional burden of this case, not out of fear for himself, but out of concern for how it affects the people he loves and the values he has always tried to uphold.

*Id.*

There is a notable additional common thread that weaves through Mr. Santarelli's support letters, and merits particularly attention here. Mr. Santarelli is highly trusting of other people, so much so as to constitute naivete. As Leon Brunnick frames it: "Marco generally approaches other people honestly . . . he can be too quick to assume that they are approaching him the same way. Most of the time that character trait is not only fine, it's to be applauded. He's genuinely a very loving and trusting guy." (Ex. 14.) After opining that Mr. Santarelli "is such a loving, gentle man who adores his daughter and family," cousin Carmela DeCiantis observes that "Marco has one fault and that is that he is too Trusting and because of that he thinks everyone else around him is also honest. Even with all of this he still has that trusting side to him. I keep telling him that unfortunately most everybody is out for themselves." (Ex. 15.)

John Fornaro, previously referenced above, has known Mr. Santarelli for his entire life, and describes how he hired him as an information technology specialist at his company in 1999. (Ex. 5.) Mr. Fornaro issues glowing praise over Mr. Santarelli's work ethic, dedication, and honesty. He turns, however, to a common theme: "A word I can use to describe Marco is that he trusts people. I believe sometimes too much." *Id.* Bryan Hall describes Mr. Santarelli as his closest friend, then observes: "It has been my observation over the years that Marco has possessed a blind spot due to his trusting and optimistic nature." (Ex. 16.) Mr. Hall further and authentically relates: "Yes, it's probably a good thing that that naivete has been knocked out of him through all of this. But it's also been hard to see the almost childish trusting side of him be crushed as well." *Id.*

CPA Ron Manabat worked directly with Mr. Santarelli and his successful Norada Real Estate Investments company for many years. (Ex. 17.) CPA Manabat comments on the ofttimes rapacious world of the investment field:

> Throughout my career as a CPA and real estate syndicator, I have spent considerable time around individuals who raise money for real estate projects and investments. In my experience, there are people who act improperly, but there are also well-intentioned individuals who find themselves in difficult situations and make misguided decisions while attempting to resolve or salvage a struggling project. Based on my personal experience with Marco over many years, I believe he falls into the latter category.

*Id.*

CPA Manabat's observations and comments are particularly instructive here. It is undisputed that Mr. Santarelli did not start Norada Capital Management ("NCM") operations with any intent to defraud anyone. He had been the chief executive of his Norada Real Estate Investments ("NRE") company for twenty-some years prior – a successful company that brokered real estate between willing sellers and willing buyers. Several letter writers describe how NRE was the envy of this market segment, and that Mr. Santarelli had achieved a position of high respect in the industry over those many years. (Ex. 18, Letter of Scott Pastel.) Mr. Santarelli then organized NCM starting in 2020 as a separate investment fund vehicle that would utilize his real estate, trade, and other contacts and relationships to build a broad investment portfolio. The funding came through "fixed interest" promissory notes ("PNs"). Mr. Santarelli had every expectation that he would be successful, and he was for a while.

After operating for more than a year, Mr. Santarelli made investments with two investment groups headed by people he had come to know and trust for some time. Mr. Santarelli *trusted* these people, and that trust brought NCM down into insolvency by wiping out almost $60 million in NCM capital. In his fervent desire to save NCM, Mr. Santarelli made the misguided decisions CPA Manabat references in his support letter. Unable to accept the failure of NCM – and absolutely convinced he could turn the NCM ship around – Mr. Santarelli broke

the law. In his fervent desire to "make good" for all the NCM investors, he acted in ways completely at odds with decades of good, honest, and successful business conduct. This is not the mine run Ponzi scheme case, where an inveterate fraudster lures gullible investors with the intention of stealing their money and living lavishly off the ill-gotten proceeds. This case is much more akin to a Greek tragedy, where the heretofore tragic hero fails and falls from grace.

## CONCLUSION

We respectfully offer these facts, comments, and observations as the necessary context through which the Guidelines encourage us to determine the minimally sufficient punishment that is no greater than necessary to achieve our federal sentencing goals of parsimony, deterrence, and individualized punishment. It is within this necessary context that we respectfully suggest that a below Guidelines sentence is fully warranted and appropriate here.

Respectfully submitted on October 1, 2026.

**THE BERNHOFT LAW FIRM, S.C.**
Attorneys for Defendant Marco Giovanni Santarelli

By: /s/ Robert G. Bernhoft
Robert G. Bernhoft, Esq.

1710 W. 6th Street
Austin, Texas 78703
(512) 582-2100 telephone
(512) 373-3159 facsimile
rgbernhoft@bernhoftlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all participants in this matter are ECF registered, and that they are served today with the foregoing document using the Court's Electronic Court Filing system.

Dated: October 1, 2026.

/s/ Robert G. Bernhoft
Robert G. Bernhoft, Esq.